# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRED KENNETH MACDONALD,<br><br>　　　　　　　　　　Plaintiff,<br>vs.<br><br>UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KENT D. HAROLDSEN; JOHN GARZON; ROBIN BAKER; ED HUGHS; DOES 1-100,<br><br>　　　　　　　　　　Defendants. | CASE NO. 11-cv-1088 – IEG (BLM)<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT [Doc. No. 23]. |

　　　This case arises from the improvident commencement of removal proceedings against Plaintiff Fred Kenneth MacDonald. As a Canadian-born American Indian, MacDonald is exempt from restrictions imposed on aliens by the United States' immigration laws and is not subject to removal. MacDonald brings this suit after having been detained for two months, deported, and spending a year outside the United States. He alleges a *Bivens* cause of action[1] for violation of his Fourth and Fifth Amendment rights, as well as violations of the Non-Detention Act ("NDA"), 18 U.S.C. § 4001, and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346. Currently before the Court is the individual Defendants' motion to dismiss or, in the alternative, for summary judgment. For the reasons set forth below, the Court **GRANTS** the motion.

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

**BACKGROUND**

MacDonald was born in Vancouver, British Columbia. His mother, Roberta Nahanee, is 100% American Indian and is a registered member of the Squamish Nation, a Canadian-recognized Indian tribe. (*See* MacDonald Decl., Ex. E [Doc. No. 29-1]; Pavone Decl., Exs. M, N [Doc. No. 29-2].) MacDonald is also a registered member of the Squamish Nation. (*See* MacDonald Decl., Exs. E, F.) On May 2, 1995, MacDonald was admitted to the United States as a lawful permanent resident ("LPR") under the classification of admission "S-13." (*Id.*, Ex. G.) MacDonald's Form I-181, which documents his status as a lawful permanent resident, indicates that he is admitted for permanent residence as a "Canadian Born American Indian." (*See id.*)

On July 21, 2009, MacDonald was arrested by the San Diego Police Department for possession of cocaine with intent to sell and possession of a dangerous weapon. On the same day, Department of Homeland Security ("DHS") officer William Pena lodged a detainer with the San Diego County Jail, requesting advance notification of MacDonald's release from custody. (Def. Motion, Ex. 005 [Doc. No. 23-2].) On August 3, 2009, MacDonald pleaded guilty to unlawful possession of cocaine with intent to sell and was sentenced to 120 days in jail and three years of probation. He was released from custody on September 28, 2009.

Upon MacDonald's release from state custody, he was taken into DHS custody. DHS officer Kourounis interviewed MacDonald and conducted computer database queries about his criminal and immigration histories.[2] (*Id.* at 021-22, 028-49.) Based upon his research, Agent Kourounis recommended that removal proceedings be commenced against MacDonald, (*id.* at 026-27), and his supervisor, Defendant Kent D. Haroldsen, approved the recommendation, (*id.* at 026). The paperwork prepared by Kourounis and reviewed by Haroldsen indicated in several places that MacDonald was admitted into the United States as a LPR under the classification "S 13." (*See id.* at 027-28, 030, 032-33, 035, 050.) MacDonald was subsequently served with an Arrest Warrant, Notice to Appear, and Custody Determination denying him release on bond. (*Id.* at 050-53.) All of these documents, which were prepared by Agent Kourounis, were approved by Defendant Haroldsen. The Notice to Appear charged MacDonald with being removable pursuant

---

[2] Kourounis is not one of the listed Defendants.

1 to 8 U.S.C. § 1237(a)(2)(B)(i) and (ii) due to his drug conviction.  (*Id.* at 050-52.)

2    MacDonald had a bond hearing before Immigration Judge ("IJ") Anthony Atenaide on
3 October 7, 2009.  (*Id.* at 055.)  He then had a removal hearing before IJ Renee L. Renner on
4 October 14, 2009.  (*Id.* at 056-57.)  At the removal hearing, MacDonald admitted all of the
5 allegations, conceded removability, waived appeal, and was ordered removed to Canada.  (*Id.*)
6 MacDonald was removed to Canada on November 27, 2009.  (*Id.* at 065.)

7    According to MacDonald, when he was held in DHS custody for deportation, he was aware
8 that his Indian status gave him special rights and that "[him] being deported might be a big
9 mistake," although he was not completely "positive" about it.  (MacDonald Decl. ¶ 7.)  He
10 indicates that he made a conscious choice not to contest the charges because, based on what he
11 observed at other immigration proceedings, he feared that if he did contest the charges, he would
12 be held in custody for at least another 6 months, or even one to three years.  (*Id.*)  Rather, in order
13 to secure his release as quickly as possible, MacDonald decided not to contest the charges, with
14 the intention to "challenge the situation from the outside."  (*Id.*)

15    MacDonald returned to the United States on January 9, 2010, and was granted admission
16 based on his prior LPR status.  Upon his return, MacDonald approached the immigration office in
17 San Diego and spoke with Defendant Ed Hughes.  He unsuccessfully attempted to explain his S-13
18 classification status to Agent Hughes and to obtain a replacement "green card," showing his LPR
19 status.  (*Id.* ¶ 83.)  According to MacDonald, he returned a week later and provided Agent Hughes
20 with supporting documentation, codes, Supreme Court decisions, and federal statutes.  (*Id.* ¶ 84.)
21 The DHS did not get back to MacDonald for approximately a year, during which time MacDonald
22 remained in Canada.  (*Id.* ¶¶ 87, 88, 89.)  On March 22, 2011, after having realized the
23 improvidence of the removal proceedings, the DHS took action to have the removal order vacated
24 and MacDonald's LPR status reinstated.  (Def. Motion, Ex. 072-74.)  In its motion to reopen
25 removal proceedings and to terminate case, the DHS expressly acknowledged that, as a Canadian-
26 born American Indian, MacDonald was "never removable" under the Immigration and Nationality
27 Act ("INA").  (*Id.*)  On March 30, 2011, the IJ terminated without prejudice the removal
28 proceedings against MacDonald and vacated the removal order.  (*Id.* at 075-76.)

MacDonald commenced this lawsuit on May 16, 2011. Defendants removed the case to this Court on May 18, 2011. On June 8, 2011, MacDonald filed his First Amended Complaint ("FAC"), alleging four causes of action: (1) Fourth Amendment violations; (2) Fifth Amendment violations; (3) violations of the NDA; and (4) violations of the FTCA. He seeks compensatory and punitive damages for the stressful conditions he had to endure while being held in the DHS custody as well as for being forced to live in Canada for a year, after having been removed there with "nothing but the California clothing on his back." (FAC ¶ 72.) Moreover, MacDonald alleges that, as the result of his deportation, he lost his catering business in Southern California and that his clothing line suffered irreparable damage and loss of inventory. (*Id.* ¶¶ 75, 76.)

The United States and the DHS filed an answer on July 18, 2011. On October 31, 2011, individual Defendants Kent Haroldsen, John Garzon, Robin Baker, and Ed Hughes filed this motion to dismiss or, in the alternative, for summary judgment.[3] Defendants contend that the case should be dismissed for lack of subject matter jurisdiction under 8 U.S.C. § 1252(g). In the alternative, Defendants contend the case should be dismissed because there is no *Bivens* cause of action under the facts of this case, MacDonald failed to state a plausible cause of action against some of Defendants under Federal Rule of Civil Procedure 12(b)(6), and Defendants are nonetheless entitled to either absolute or qualified immunity. MacDonald filed an opposition, and Defendants replied. On December 22, 2011, the Court heard oral argument on the motion.

**DISCUSSION**

**I.   Status of Canadian-born American Indians**

It is undisputed that if MacDonald is an American Indian born in Canada and possesses 50% of American Indian blood, then he is entitled to special privileges not afforded to other aliens.[4] The right of the American Indians to move freely between Canada and the United States was first recognized in the Jay Treaty of 1794 and was reiterated in the Explanatory Article of

---

[3] The individual Defendants previously filed a motion to dismiss for lack of proper service, which the Court denied on August 23, 2011. [*See* Doc. Nos. 6, 19.]

[4] MacDonald claims membership in the Squamish Nation, whose territory is in what is now British Columbia. Squamish village sites in Vancouver trace back approximately 3,000 years. For purposes of this motion, Defendants do not challenge the factual basis of MacDonald's claim that he is an eligible Canadian-born American Indian, although they reserve the right to do so at a later time.

1796. *See* Treaty of Amity, Commerce and Navigation, U.S.—Great Britain, art. III, Nov. 19, 1794, 8 Stat. 116 ("It is agreed that it shall at all times be free to his Majesty's subjects, and to the citizens of the United States, and also to the Indians dwelling to either side of the said boundary line, freely to pass and repass by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America . . . ."); Explanatory Article to Article 3 of the Jay Treaty, U.S.—Great Britain, May 5, 1796, 8 Stat. 130 ("That no stipulations in any treaty subsequently concluded by either of the contracting parties with any other State or Nation, or with any Indian tribe, can be understood to derogate in any manner from the rights of free intercourse and commerce secured by the aforesaid third Article of the treaty of Amity, commerce and navigation, to the subjects of his Majesty and to the Citizens of the United States and to the Indians dwelling on either side of the boundary-line aforesaid; but that all the said persons shall remain at full liberty freely to pass and repass by land or inland navigation, into the respective territories and countries of the contracting parties, on either side of the said boundary-line . . . .").

In 1928, to secure this right of free passage, Congress enacted the Act of April 2, 1928, 45 Stat. 401, which provided that the Immigration Act of 1924 "shall not be construed to apply to the right of American Indians born in Canada to pass the borders of the United States." Today, this provision is codified in 8 U.S.C. § 1359 and provides as follows:

> Nothing in this subchapter shall be construed to affect the right of American Indians born in Canada to pass the borders of the United States, but such right shall extend only to persons who possess at least 50 per centum of blood of the American Indian race.

Prior to 1978, the Bureau of Indian Affairs ("BIA") construed § 1359 narrowly as providing only that Canadian-born American Indians could not be precluded from entering the United States. *See Matter of Yellowquill*, 16 I. & N. Dec. 576, 577-78 (BIA 1978). Thus, the BIA's position was that although an American Indian born in Canada could be deported, each time he sought admission to the United States, he could not be refused and entered "with a clean slate." *Id.* In the *Matter of Yellowquill*, the BIA reconsidered its position and, relying on the decision in *Akins v. Saxbe*, 380 F. Supp. 1210 (D. Me. 1974), held that "American Indians born in Canada who are within the protection of section 289 of the Act are not subject to deportation on any ground." *Id.* at 578.

///

## II.     Subject matter jurisdiction

Defendants first contend that the whole case should be dismissed because 8 U.S.C. § 1252(g) divests this Court of jurisdiction.  Section 1252(g) provides in full:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

The Supreme Court has held that § 1252(g) should not be construed as encompassing the universe of all possible acts and events arising from the removal proceedings.  *See Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482 (1999).  Rather,

> [t]he provision applies only to three discrete actions that the Attorney General may take: her "decision or action" to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders."  There are of course many other decisions or actions that may be part of the deportation process—such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order.
>
> It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings.

*Id.* (emphasis in original).  The Supreme Court has explained that § 1252(g) was aimed at preserving prosecutorial discretion.  *Id.* at 483-85.

Courts have applied § 1252(g) to various components of the decision to "commence" or "adjudicate."  For example, § 1252(g) has been held to strip courts of jurisdiction to review the decision whether removal proceedings should be commenced at all, *see Sissoko v. Rocha*, 509 F.3d 947, 950 (9th Cir. 2007) (no jurisdiction to hear false arrest claim based on removal proceedings); the decision to delay commencement of proceedings to a future date, *see Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 598-99 (9th Cir. 2002); or whom to target in such proceedings, *see AADC*, 525 U.S. at 473, 492 (no jurisdiction to hear suit alleging selective deportations based on affiliations with an unpopular political group).

On the other hand, courts have held that § 1252(g) does not bar judicial review of decisions or actions that occur during the formal adjudicatory process, *see Barahona-Gomez v. Reno*, 236 F.3d 1115, 1120-21 (9th Cir. 2001), or of due process violations that occur before and during the

1 removal proceedings, *see Kwai Fun Wong v. United States*, 373 F.3d 952, 964-65 (9th Cir. 2004)
2 (concluding that § 1252(g) did not bar review of immigration officials' allegedly discriminatory
3 decisions regarding advance parol, adjustment of status, and revocation of parole); *Sulit v.*
4 *Schiltgen*, 213 F.3d 449, 452-53 (9th Cir. 2000) (concluding that § 1252(g) did not bar the due
5 process claims of aliens alleging that their green cards were improperly seized without a hearing,
6 that the immigration officials failed to provide them with notice requiring them to surrender for
7 deportation, and that their counsel failed to notify them of the issuance of the court's decision).

8     A.    <u>MacDonald is an "alien" for purposes of the INA</u>

9     Before the Court can determine whether § 1252(g) applies to bar judicial review of
10 MacDonald's claims, the Court has to determine whether MacDonald qualifies as an "alien" under
11 the INA.  *See* 8 U.S.C. § 1252(g) ("[N]o court shall have jurisdiction to hear any cause or claim by
12 or on behalf of any *alien* arising from the decision or action by the Attorney General to commence
13 proceedings, adjudicate cases, or execute removal orders against any *alien* under this chapter."
14 (emphases added)).  The INA defines an "alien" as "any person not a citizen or national of the
15 United States."  8 U.S.C. § 1101(a)(3).  Because MacDonald was not born or naturalized in the
16 United States, he is not a United States "citizen."  *See* 8 U.S.C. § 1401 *et seq.* (defining a United
17 States citizen and national at birth); *id.* § 1421 (naturalization authority).  Similarly, because there
18 is no indication that MacDonald otherwise "owes permanent allegiance" to the United States, he is
19 not a "national of the United States."  *See* 8 U.S.C. § 1101(a)(22).  Moreover, the applicable
20 federal regulations list American Indians born in Canada among the "*[a]liens* not required to
21 obtain immigration visas."  *See* 22 C.F.R. § 42.1(f) (emphasis added).  Thus, it appears that
22 MacDonald is an "alien" under the INA definition.  *See* 8 U.S.C. § 1103(a)(3).

23     MacDonald's arguments to the contrary are not persuasive.  It might be true, as MacDonald
24 extensively argues, that because American Indians were present on the North American continent
25 since time immemorial, they are the true "citizens" of this continent.  This fact, however, bears no
26 effect on whether MacDonald is an "alien" for purposes of 8 U.S.C. § 1252(g).

27     Similarly, MacDonald's status as a Canadian-born American Indian does not exempt him
28 from § 1252(g)'s application.  MacDonald argues that it is impossible to reconcile the plain

1  language of 8 U.S.C. § 1359, which provides that "[n]othing in this subchapter shall be construed
2  to affect the right of American Indians born in Canada to pass the borders of the United States,"
3  with the language of 8 U.S.C. § 1252(g), which applies "notwithstanding any other provision of
4  law." Because they are apparently irreconcilable, MacDonald contends the Court should construe
5  them in favor of preserving the rights of the Canadian-born American Indians. *See Akins*, 380 F.
6  Supp. at 1221 ("(1) [T]he language of statutes and treaties affecting Indians must be construed in a
7  nontechnical sense, as the Indians themselves would have understood it and in a manner reflecting
8  the conditions prompting its adoption, and (2) ambiguities in statutes and treaties conferring
9  benefits on Indians are to be resolved in favor of the Indians."). However, the Court believes that
10 it is possible to reconcile the two statutes. As Defendants argue, the fact that § 1252(g) might
11 apply to bar judicial review of some of Canadian-born American Indians' claims does not *by itself*
12 interfere with their "right . . . to pass the borders of the United States." Rather, what interferes
13 with that right is the decision by a particular immigration official to not allow a particular
14 Canadian-born American Indian into the United States or deporting that individual, even though he
15 could not otherwise be removed. Section 1252(g) merely applies to bar judicial review of some of
16 the subsequent claims.[5] *See AADC*, 525 U.S. at 482. Accordingly, MacDonald is an "alien" as
17 contemplated in § 1252(g), and therefore that section applies to him.

18         B.      Specific actions and decisions

19         As previously noted, however, even if § 1252(g) applies to MacDonald, it only applies to
20 three discrete actions that the Attorney General may take: his "decision or action" to "*commence*
21 proceedings, *adjudicate* cases, or *execute* removal orders." *See AADC*, 525 U.S. at 482. Ninth
22 Circuit case law makes clear that a Fourth Amendment challenge to confinement during removal
23 proceedings is one such decision or action because it stems directly from the Attorney General's

---

[5] The approach advocated by MacDonald—whereby the Court should let § 1359 control § 1252(g)—would be hard to reconcile with § 1252(g)'s unambiguous indication that it applies to the specified challenges "notwithstanding any other provision of law." *But see Or. Natural Res. Council v. Thomas*, 92 F.3d 792, 796 (9th Cir. 1996) ("We have repeatedly held that the phrase 'notwithstanding any other law' is not always construed literally."). Moreover, the INA provides that the alien has the burden of proof in establishing that he is not removable. *See* 8 U.S.C. § 1361; *see also United States v. Curnew*, 788 F.2d 1335, 1338 (8th Cir. 1986). Accordingly, the two statutes are best reconciled by requiring Canadian-born American Indians to raise their non-removability *during* the removal proceedings, rather than attempt to challenge those proceedings after removal.

decision to *commence* the removal proceedings. *See Sissoko*, 509 F.3d at 950 (concluding that § 1252(g) barred the alien's Fourth Amendment-based damages claim for false arrest because that claim directly challenged the defendant's decision to commence expedited removal proceedings and because an alternative habeas remedy directly addressing the claimed injury was available). In this case, MacDonald's Fourth Amendment claim alleges that "Defendants caused MacDonald to be arrested and incarcerated on a legally invalid basis, which is a violation of his right to be free from unlawful seizure under the Fourth Amendment."  (FAC ¶ 98.)  It is evident that this claim falls squarely within § 1252(g) because it challenges the very decision to commence the removal proceedings against MacDonald.  Accordingly, the Court lacks jurisdiction to hear this claim. *See AADC*, 525 U.S. at 482; *Sissoko*, 509 F.3d at 950.  The Court, therefore, **GRANTS** the motion to dismiss MacDonald's first cause of action for violation of the Fourth Amendment.

On the other hand, the Court does have jurisdiction to hear MacDonald's Fifth Amendment claim.  In that claim, MacDonald alleges:

> 102.   Defendants violated MacDonald's due process rights because they did not "process" that he was an American Indian and not subject to deportation given his category S13 classification.
>
> 103.   Rather, defendants erroneously processed him as an immigrant who was subject to deportation upon conviction of a crime under section 237 of the Immigration and Nationality Act, rather than appreciating that he was not subject to deportation under section 289 of that same Act.
>
> 104.   The failure to process plaintiff correctly under the Act deprived MacDonald of his right to "due" process of law and caused him damage in that he was subjected to an illegal deportation proceeding and proximate and foreseeable other damages.

(FAC ¶¶ 102, 103, 104.)  The Ninth Circuit has concluded that § 1252(g) did not remove the courts' jurisdiction to hear due process claims arising out of the removal proceedings, as long as those claims do not relate to the three discrete actions mentioned earlier.  Thus, in *Kwai Fun Wong*, 373 F.3d at 964-65, the Ninth Circuit held that it had jurisdiction to review immigration officials' allegedly discriminatory decisions regarding advance parol, adjustment of status, and revocation of parole, where the plaintiff contended that those actions took place *prior* to any decision to "commence" the removal proceedings.  Similarly, in *Sulit*, 213 F.3d at 452-53, the Ninth Circuit concluded that plaintiffs' due process claims, whereby they argued that their "green cards" were improperly seized by the INS without a hearing; that the INS failed to provide them

1  with any notice requiring them to surrender for deportation; and that their counsel failed to notify
2  them that the Ninth Circuit had issued a decision in their case, were not precluded by 8 U.S.C. §
3  1252(g) because they "implicate[d] none of the 'decisions or actions' of the INS to 'commence
4  proceedings, adjudicate cases, or execute removal orders'" (citations omitted).

5  In this case, § 1252(g) does not bar judicial review of MacDonald's Fifth Amendment
6  claim. According to MacDonald, he was denied due process when the immigration officials failed
7  to appreciate that his "S13" classification exempted him from the removal proceedings. Just like
8  in *Kwai Fun Wong*, this claim challenges the action—or, rather, inaction—of the agents *prior* to
9  any decision to "commence" the removal proceedings. *See* 373 F.3d at 964-65. As such, the
10 Court has jurisdiction to hear this claim. *See id.*; *see also Sulit*, 213 F.3d at 452-53.

11     C.    *Bivens* cause of action

12 Even though § 1252(g) does not bar MacDonald's Fifth Amendment claim, the Court may
13 still lack jurisdiction to consider it if the Court determines that it cannot imply a *Bivens* cause of
14 action in this case. In *Bivens*, the Supreme Court "recognized for the first time an implied private
15 action for damages against federal officers alleged to have violated a citizen's constitutional
16 rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). In the years following *Bivens*,
17 however, the Supreme Court recognized a *Bivens* cause of action on only two occasions. *See*
18 *Carlson v. Green*, 446 U.S. 14, 24 (1980) (suit by a federal inmate against prison officials under
19 the Cruel and Unusual Punishments Clause of the Eighth Amendment); *Davis v. Passman*, 442
20 U.S. 228, 248–49 (1979) (suit against a former employer, a member of the United States Congress,
21 for employment discrimination in violation of the Due Process Clause of the Fifth Amendment).

22 Nonetheless, the Ninth Circuit has already extended *Bivens* to due process claims arising in
23 deportation proceedings. For example, in *Papa v. United States*, 281 F.3d 1004, 1010-11 (9th Cir.
24 2002), the court concluded that the plaintiffs have asserted a valid *Bivens* claim sufficient to
25 withstand the motion to dismiss "based on their allegations that the guards in the [INS] detention
26 facility knowingly placed Mr. Papa in harm's way, with conscious disregard for, or deliberate
27 indifference to, his rights under the Due Process Clause." In this case, MacDonald has similarly
28 asserted a valid *Bivens* claim sufficient to withstand the motion to dismiss based on his allegations

that the immigration officials erroneously processed him as an immigrant when he should have been fully exempt from the application of the United States' immigration laws.

Defendants' reliance on the Ninth Circuit's recent decision in *Mirmehdi v. United States*, — F.3d —, 2011 WL 5222884 (9th Cir. Nov. 3, 2011), is inapposite. There, the court concluded that *Bivens* did not provide remedy for aliens not lawfully in the United States to sue federal agents for monetary damages for wrongful detention pending deportation. *Id.* at *4. As MacDonald points out, there are many crucial differences between *Mirmehdi* and this case. First, in *Mirmehdi*, the Ninth Circuit emphasized that it was only deciding as to whether a *Bivens* remedy should be available to aliens unlawfully present in the United States. *See id.* at *1 ("We are asked to decide, among other things, whether an alien not lawfully in the United States may sue for monetary damages claiming constitutionally invalid detention."); *id.* at *3 (defining the relevant "context" in that case as deportation proceedings involving illegal immigrants); *id.* at *3 n.3 ("[W]e must consider whether an immigrant may bring a *Bivens* claim to vindicate certain constitutional rights separately from whether a citizen may bring such a *Bivens* claim."). Unlike plaintiffs in *Mirmehdi*, who were citizens of Iran unlawfully present in the United States, MacDonald was at all times lawfully present in the United States. Moreover, although the Court rejects MacDonald's argument that he is more akin to a "citizen" than an "alien," as a Canadian-born American Indian, MacDonald is entitled to more privileges and immunities than other aliens. *See, e.g.*, *Matter of Yellowquill*, 16 I. & N. Dec. at 578 (concluding that Canadian-born American Indians are not subject to deportation on any ground); 8 U.S.C. § 1612(a)(2)(G)(i) (providing that Canadian-born American Indians are eligible for benefits for certain specified federal programs).

Furthermore, the aliens in *Mirmehdi* were suspected of being supporters of a known terrorist organization. In declining to find that *Bivens* remedy was available, the Ninth Circuit relied on these "unique foreign policy considerations." *Mirmehdi*, 2011 WL 5222884, at *4. In the present case, however, such policy considerations are not present. To the contrary, the policy considerations here weigh *in favor* of finding a remedy for an individual who, as a Canadian-born American Indian, was fully exempt from removal proceedings. In this respect, MacDonald's case is more alike to that of a United States citizen being deported. Although neither party offers a case

on point, it seems reasonable that courts would extend a *Bivens* action for due process violations if a United States citizen was erroneously subjected to removal proceedings and subsequently "exiled" from the country. The Court will do the same for a Canadian-born American Indian.

Finally, the Court rejects Defendants' argument that MacDonald had a viable remedy available through the habeas corpus statute. In determining whether to imply a *Bivens* cause of action, the Court must ask two questions: (1) whether there are any "special factors counseling hesitation in the absence of affirmative action by Congress," *Bivens*, 403 U.S. at 396, and (2) whether "Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective," *Carlson*, 446 U.S. at 18-19. *See also Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (setting forth the two-pronged approach). As discussed above, unlike *Mirmehdi*, this is not the case where any special factors counsel hesitation in implying a remedy. As for an alternative remedy, it is unclear whether recourse to a habeas statute would serve as a "substitute" for recovery that is "equally effective." *See Carlson*, 446 U.S. at 19-20 (finding recovery under the FTCA to not be an equally effective substitute to money damages against the individual agents for violations of the Eighth Amendment). *But see Mirmehdi*, 2011 WL 5222884, at *4 (noting that the plaintiffs could—and did—challenge their detention through the habeas statute).

As the Supreme Court has noted, in addition to compensating the victims, the *Bivens* remedy "serves a deterrent purpose." *Carlson*, 446 U.S. at 21. "Because the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent . . . . It is almost axiomatic that the threat of damages has a deterrent effect, surely particularly so when the individual official faces personal financial liability." *Id.* (internal citations omitted). In the present case, should the Court or the jury later conclude that the immigration officials acted recklessly or with gross negligence in failing to recognize that MacDonald could not be deported, this appears to be a case where extending *Bivens* would provide the necessary deterrent effect for the constitutional violation.

Accordingly, the Court concludes that a *Bivens* remedy is available to MacDonald as to his Fifth Amendment due process claim.

///

### III. Non-Detention Act

Defendants next contend that the Court should dismiss MacDonald's NDA claim because the NDA applies only to "citizens." MacDonald, on the other hand, argues that he is protected by the NDA because he occupies "the same legal position" as citizens under the NDA.

The NDA provides that "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a). On its face, the NDA applies only to "citizens." MacDonald has not cited any legal authority to the contrary.[6] As such, MacDonald failed to state a claim for relief under the NDA. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) ("Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."). The Court, therefore, **DISMISSES** the NDA claim against the individual Defendants.

### IV. Federal Tort Claims Act

Defendants next move to dismiss the FTCA claims against each of them. It is well-settled that the United States is the only proper defendant in an FTCA action. *Woods v. United States*, 720 F.2d 1451, 1452 n.1 (9th Cir. 1983); *see also* Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563; 28 U.S.C. § 2679(b). Accordingly, the Court **DISMISSES** the FTCA claim against the individual Defendants.

### V. Individual Defendants

Finally, Defendants contend that the action should be dismissed against each of them either for failure to state a claim or on the basis of absolute or qualified immunity from liability.

#### A. Ed Hughes

Defendants seek to dismiss the claims against Defendant Hughes because the FAC does not allege that Hughes had any involvement in the decision to apprehend MacDonald, to commence or prosecute removal proceedings against him, or to detain him. Rather, the only complained of

---

[6] MacDonald argues that the legislative history suggests that the NDA was meant to assuage fears among people that the government could not detain its people other than by an act of Congress pursuant to a duly enacted law. Accordingly, since he cannot be legally detained under the INA, MacDonald argues he is entitled to the protections of the NDA. However, MacDonald fails to cite any legal authority for the proposition that the Court can ignore the specific language of the NDA, which provides that it applies only to "citizen[s]." *See* 18 U.S.C. § 4001(a).

action occurred when MacDonald returned to the United States, *after* having been deported, and sought to obtain a replacement LPR card. MacDonald counters that Agent Hughes is liable for the constitutional violations because he enforced the "illegal" deportation order and effectively kept MacDonald out of the United States after MacDonald was deported.

The Court **GRANTS** the motion to dismiss with respect to Hughes. The only remaining cause of action is for violation of the Fifth Amendment, which focuses on the DHS officials' failure to realize that MacDonald was not subject to removal. (*See* FAC ¶¶ 98, 99, 102, 103, 104.) As MacDonald concedes, however, Agent Hughes was not involved in that initial determination. Moreover, the FAC fails to allege any facts from which it could be concluded that Hughes committed any violation when he advised MacDonald that he could not remain in the United States with a valid removal order against him. *See* 8 C.F.R. § 1001.1(p) (indicating that an immigrant's lawful permanent resident status "terminates upon entry of a final administrative order of exclusion, deportation, removal, or rescission"). Rather, it appears that Hughes did all that he could do by referring the question to the appropriate authorities who could resolve MacDonald's dilemma. Accordingly, because the FAC alleges no facts to plausibly state a claim to relief as to the Fifth Amendment violation against Hughes, the Court **DISMISSES** this cause of action against Hughes **without leave to amend**. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011) (leave to amend may be denied where any amendment would be futile).

B.   John Garzon

Defendants seek to dismiss claims against Defendant Garzon because there are no allegations that he was personally involved in any of the alleged conduct. The only allegations against Garzon are that he "is believed to be a field office director responsible for the detention of persons being subjected to deportation in San Diego," (FAC ¶ 5), and that he "is responsible for MacDonald's incarceration," (FAC ¶ 56). It is axiomatic that liability for constitutional violations cannot be premised on a *respondeat superior* theory; rather, the plaintiff must allege personal participation by the defendant. *See Iqbal*, 129 S. Ct. at 1949; *Bibeau v. Pac. Northwest Research Found., Inc.*, 188 F.3d 1105, 1114 (9th Cir. 1999); *Terrell v. Brewer*, 935 F.2d 1015, 1018 (9th Cir.

1 1991). Accordingly, because the FAC fails to allege facts that would plausibly state a claim for
2 relief against Defendant Garzon, the Court **GRANTS** the motion to dismiss in this regard. *See*
3 *Iqbal*, 129 S. Ct. at 1949. Moreover, because any amendment would be futile, the Court dismisses
4 the claims against Garzon **without leave to amend**.[7] *See Cervantes*, 656 F.3d at 1041.

5     C.    Robin Baker

6     Defendants next seek to dismiss claims against Defendant Baker because there are no
7 allegations that he was personally involved in any of the alleged conduct. The only allegation in
8 the FAC is that Baker "is believed to have played a role in the incarceration and deportation" of
9 MacDonald. (FAC ¶ 6.) In his opposition, however, MacDonald highlights the fact that Baker
10 signed the final document authorizing the execution of the IJ's removal order. (*See* Pavone Decl.,
11 Ex. J.) Moreover, just as with Garzon, MacDonald asks the Court for additional time to perform
12 discovery as to Baker's personal involvement. *See* Fed. R. Civ. P. 56(e).

13     Baker's signature on the final document authorizing the execution of the IJ's removal order
14 is not sufficient to allege personal participation on behalf of Baker in MacDonald's apprehension,
15 detention, or removal. Accordingly, at this time, MacDonald failed to state a *Bivens* claim against
16 Baker. *See Iqbal*, 129 S. Ct. at 1949; *Bibeau*, 188 F.3d at 1114; *Terrell*, 935 F.2d at 1018. The
17 Court, therefore, **GRANTS** Defendants' motion to dismiss the Fifth Amendment claim against
18 Defendant Baker. Nonetheless, because it appears that amendment of this cause of action might be
19 possible, the Court **DISMISSES** this claim against Baker **with leave to amend**.

20     D.    Kent Haroldsen

21     Defendants contend that Haroldsen is entitled to absolute prosecutorial immunity due to his
22 performance of a quasi-judicial function. In the alternative, Defendants argue Haroldsen is
23 entitled to qualified immunity because his actions were based on a reasonable mistake of fact.
24 MacDonald, on the other hand, contends that Haroldsen is not entitled to absolute prosecutorial

---

[7] MacDonald's only argument in opposition is that, at this time, he does not have all of the facts to known the extent of Defendant Garzon's involvement in his detention. Accordingly, relying on Federal Rule of Civil Procedure 56(e), MacDonald asks the Court for an opportunity to conduct discovery to support the claims against Garzon. However, because the only possible allegations against Garzon appear to be in his supervisory capacity, it is clear that any amendment in this case would be futile. *See Cervantes*, 656 F.3d at 1041.

immunity because he was acting more like a police officer than a prosecutor. Moreover, MacDonald argues Haroldsen is not entitled to qualified immunity because the right at issue was clearly established and because ignorance of the law is not a mistake of fact.

Prosecutors are absolutely immune from civil suits for damages which challenge activities related to the initiation and presentation of criminal prosecutions. *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976). Such immunity applies even if it leaves "the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Id.* Determining whether a prosecutor's actions are immunized requires a functional analysis. The classification of the challenged acts, not the motivation underlying them, determines whether absolute immunity applies. *See Ashelman v. Pope*, 793 F.2d 1072, 1076 (9th Cir.1986) (en banc). If the action was part of the judicial process, the prosecutor is entitled to the protection of absolute immunity regardless of the motivation and of whether he violated the civil plaintiff's constitutional rights. *See Imbler*, 424 U.S. at 431 n.34 (noting that absolute immunity applies even where there was "the deliberate withholding of exculpatory information"); *Ashelman*, 793 F.2d at 1078 ("We therefore hold that a conspiracy between judge and prosecutor to predetermine the outcome of a judicial proceeding, while clearly improper, nevertheless does not pierce the immunity extended to judges and prosecutors."); *Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003) ("A prosecutor is also absolutely immune from liability for the knowing use of false testimony at trial."). Immunity also extends to attorneys who perform quasi-judicial tasks in civil actions. *See, e.g.*, *Butz v. Economou*, 438 U.S. 478, 512-13 (1978) (extending the immunity to federal administrative agency proceedings).

In this case, Haroldsen is entitled to absolute immunity to the extent he was performing functions akin to a prosecutor. Specifically, the FAC and the Notice to Appear attached to Defendants' motion indicate that Haroldsen's only conduct in this case was in approving Agent Kourounis's recommendation that removal proceedings be commenced against MacDonald and signing the Notice to Appear, which resulted in MacDonald's seizure. (*See* FAC ¶¶ 49, 54, 55; *see also* Def. Motion, Ex. 026.) Haroldsen based this action on his review of the information prepared by Agent Kourounis. There is no indication that Haroldsen had any improper motive when

commencing the removal proceedings against MacDonald or that he based his decision on falsified information. *Cf. Imbler*, 424 U.S. at 431 n.34 (absolute immunity would apply even if there was a deliberate withholding of information); *Ashelman*, 793 F.2d at 1078 (absolute immunity applied even where there was improper conduct by the judge and prosecutor); *Broam*, 320 F.3d at 1030 (absolute immunity applied even where there was knowing use of false testimony at trial). Rather, given his authority to commence removal proceedings against aliens by charging them with deportability, it appears that Haroldsen's conduct fell clearly within the intended scope of the absolute prosecutorial immunity. Therefore, to the extent Haroldsen was acting as a prosecutor, the Court **GRANTS** the motion to dismiss claims against him on the basis of absolute immunity.

There is a possibility, however, that MacDonald might be able to amend his complaint to allege actions by Haroldsen that fall outside the scope of absolute immunity. For example, if some of his acts were more investigatory, rather than prosecutorial, Haroldsen might be entitled to only qualified immunity. *See Buckley v. Fitzimmons*, 509 U.S. 259, 273 (1993) ("A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity."). Of course, if any such investigatory acts were undertaken "in preparing for the initiation of [removal] proceedings" and occurred in the course of his role as an advocate for the government, they would still be covered by absolute immunity. *See id.* Accordingly, at this time, the Court dismisses the Fifth Amendment claim against Haroldsen **with leave to amend**.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss or, in the alternative, for summary judgment, and **ORDERS** as follows:

- MacDonald's first cause of action for violation of the Fourth Amendment against all of the individual Defendants is **DISMISSED with prejudice**;
- MacDonald's third cause of action for violation of the Non-Detention Act against all of the individual Defendants is **DISMISSED with prejudice**;
- MacDonald's fourth cause of action for violation of the Federal Tort Claims Act against all of the individual Defendants is **DISMISSED with prejudice**;

- MacDonald's second cause of action for violation of the Fifth Amendment against Defendants Hughes and Garzon is **DISMISSED without leave to amend**; and
- MacDonald's second cause of action for violation of the Fifth Amendment against Defendants Baker and Haroldsen is **DISMISSED with leave to amend**.

If MacDonald wishes to amend any of the causes of action that the Court dismissed with leave to amend, he may do so **within 21 days** of the filing of this Order.

**IT IS SO ORDERED.**

Date:  **December 23, 2011**

_____

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**